OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal presents two questions regarding the Freedom of Information Law (FOIL): first, does material received by a corporation providing services for a State university and kept on behalf of the university constitute a "record” that is presumptively discoverable under FOIL; and second, when does disclosure of information obtained from a commercial enterprise fall within the FOIL exemption for commercial information (Public Officers Law § 87 [2] [d])? We conclude, here, that the material constituted a record subject to disclosure under FOIL but exempt because release of the information sought by petitioner would cause substantial injury to its competitor.
 

 I.
 

 The principal business of petitioner Encore College Bookstores, Inc. is the acquisition, collection and sale of college textbooks and other learning-related materials. Encore operates a bookstore near the Farmingdale campus of respondent State University of New York (SUNY), a public university established pursuant to Education Law § 352.
 

 Respondent Auxiliary Service Corporation of the State University of New York Agricultural and Technical College at
 
 *415
 
 Farmingdale (ASC) is a not-for-profit corporation created in 1954. According to ASC’s bylaws, its general purpose is "to establish, operate, manage and promote educationally related services for the benefit of the [SUNY] Campus Community, including faculty, staff and students in harmony with the educational mission and goals of the College.” As explained in ASC’s agreement with SUNY, the university "requires certain auxiliary services at the Campus in order to carry out its essential educational mission,” and ASC "has been organized for the purpose of providing such services.”
 

 Among the services ASC is charged with furnishing for SUNY is a campus bookstore, which ASC provides through a subcontractor. The Request for Proposals circulated by ASC to prospective subcontractors in March 1992 obligated the successful bidder to stock all required, recommended and suggested course books designated by SUNY faculty in sufficient quantity to meet student needs. SUNY agreed to provide the subcontractor with the necessary data, such as course numbers, section numbers and enrollment figures, and the subcontractor agreed to provide ASC with three lists of all faculty book orders. Barnes & Noble Bookstores, Inc. was the successful bidder for the campus bookstore subcontract.
 

 In order to ensure that the bookstore had a complete inventory of the textbooks needed for the upcoming semester, Barnes & Noble sent each faculty member a purchase order form on which they listed the desired books. Two copies of the completed form were returned to Barnes & Noble, and the third was sent to ASC so that it could monitor the subcontractor’s compliance with the agreement. When problems with availability arose or faculty failed to respond to this initial inquiry, Barnes & Noble store managers followed up by letter, telephone or in person. Neither SUNY nor ASC maintains any policy precluding other persons from acquiring the textbook information directly from SUNY faculty.
 

 In November 1992, Encore served SUNY with a FOIL request seeking disclosure of the booklist compiled by Barnes & Noble for the 1993 spring semester. At that time, it was the practice of Barnes & Noble to forward one copy of the booklist to the head of each department. When SUNY denied the request, Encore commenced a CPLR article 78 proceeding. SUNY then produced the list pursuant to a stipulation, and Encore discontinued its proceeding.
 

 Soon thereafter, Barnes & Noble changed its practice of sending SUNY a copy of the booklist, and faculty members stopped
 
 *416
 
 forwarding one copy of the purchase order forms to the university. Barnes
 
 &
 
 Noble asserted that its campus bookstore had suffered a decrease in sales revenue following disclosure of the spring semester booklist to Encore, and the purpose of the change was to protect the information from disclosure under FOIL.
 

 In the spring of 1993, Encore filed a second FOIL request, this time for the 1993 fall semester booklist. SUNY denied the request, explaining that it no longer had input into the process of collecting the solicited information or received copies of the book requisition forms.
 

 Encore then commenced the instant article 78 proceeding against respondents SUNY and ASC by order to show cause, seeking disclosure of information regarding the books to be used in each department or college for the 1993 fall semester. The trial court dismissed the petition, finding first that SU-NY’s lack of involvement in gathering the requested information released it from any obligation to produce the information under FOIL, and second that the information was exempt from disclosure by ASC because its release would impair current contract awards (Public Officers Law § 87 [2] [c]). The Appellate Division affirmed. It too held that SUNY was not obligated under FOIL to produce material neither created by it nor within its possession and control and additionally that, assuming ASC was subject to FOIL, the information was exempt because disclosure would cause substantial injury to the competitive position of Barnes & Noble (Public Officers Law § 87 [2] [d]). We agree with the latter conclusion and affirm as to ASC on that ground. We nevertheless grant the petition as to SUNY, because the university has not independently raised the exemption before this Court.
 

 II.
 

 The purpose of FOIL, found in article 6 of the Public Officers Law, is to shed light on government decision making, which in turn both permits the electorate to make informed choices regarding governmental activities and facilitates exposure of waste, negligence and abuse
 
 (see,
 
 Public Officers Law § 84;
 
 Matter of Fink v Lefkowitz,
 
 47 NY2d 567, 571). In furtherance of this objective, the Legislature in 1977 restructured article 6, imposing a broad standard of open disclosure in order to achieve maximum public access to government documents (L 1977, ch 933).
 

 Unlike the prior statute, which listed discrete categories of information open to the public
 
 (see,
 
 Public Officers Law former
 
 *417
 
 § 88 [repealed by L 1977, ch 933,1]), FOIL now mandates that "[e]ach agency shall * * * make available for public inspection and copying
 
 all
 
 records,” unless the records fall within a statutory exemption (Public Officers Law § 87 [2] [emphasis added]). The Legislature also added a definition of "records” that implements the policy favoring disclosure and makes "the vast majority of requested documents presumptively discoverable”
 
 (Matter of Washington Post Co. v New York State Ins. Dept.,
 
 61 NY2d 557, 564). "Records” include "any information kept, held, filed, produced or reproduced by, with or for an agency” (Public Officers Law § 86 [4]). Significantly, this "very broad definition” is not limited by the purpose for which a document was originated or the function to which it relates
 
 (Washington Post Co. v New York State Ins. Dept.,
 
 61 NY2d at 564;
 
 Matter of Westchester Rockland Newspapers v Kimball,
 
 50 NY2d 575, 581).
 

 SUNY, a public university, clearly constitutes an "agency,” defined as "any * * * governmental entity performing a governmental or proprietary function for the state” (Public Officers Law § 86 [3];
 
 see, Matter of Russo v Nassau County Community Coll.,
 
 81 NY2d 690, 698). We must therefore determine as a threshold matter whether the list sought by Encore is a "record” that SUNY must make available to the public. In doing so, we are mindful that FOIL itself is to be read liberally and its exemptions read narrowly
 
 (id.,
 
 at 697).
 

 In order to fulfill its educational mission, SUNY must provide certain auxiliary services to its campus community. As set forth unequivocally in ASC’s bylaws, the function of ASC is to supply these essential services — including the campus bookstore — for SUNY. ASC’s acts in discharging this delegated duty, then, are performed on SUNY’s behalf.
 

 Because ASC receives a copy of the booklist compiled by its subcontractor, Barnes & Noble, to ensure that the campus bookstore is adequately maintained, it does so for the benefit of SUNY, a government agency. In other words, the booklist information is "kept” or "held” by ASC "for an agency” (Public Officers Law § 86 [4]). Thus, the information falls within the unambiguous definition of the term "records” under FOIL.
 

 SUNY’s contention that disclosure turns solely on whether the requested information is in the physical possession of the agency ignores the plain language of FOIL defining "records” as information kept or held "by, with or for an agency” (Public Officers Law § 86 [4]). Where, as here, the literal language of a statute is precise and unambiguous, that
 
 *418
 
 language is determinative
 
 (Roth v Michelson,
 
 55 NY2d 278;
 
 see also, Matter of Capital Newspapers v Whalen,
 
 69 NY2d 246, 248 [giving words their natural and most obvious meaning in interpreting "records” under FOIL]).
 

 SUNY’s reliance on cases interpreting the Federal disclosure statute is similarly misplaced. To be sure, New York’s Freedom of Information Law is patterned after the Federal Freedom of Information Act (FOIA), which requires production of "agency records”
 
 (see,
 
 5 USC § 552;
 
 Matter of Fink v Lefkowitz,
 
 47 NY2d at 572, n). FOIA, however, contains no definition of the term "records.” Thus, although the scope of "agency records” under FOIA has been limited by the courts to material (1) created or obtained by the agency, and (2) in the agency’s control
 
 (see, e.g., Department of Justice v Tax Analysts,
 
 492 US 136, 144-145), this construction rested in part on the definition of "records” contained in two similar Federal statutes: The Records Disposal Act (defining "agency records” as documents "made or received by an agency” [44 USC § 3301]) and the Presidential Records Act of 1978 (defining "Presidential records” as material "created or received by the President” [44 USC § 2201 (2)];
 
 see, Forsham v Harris,
 
 445 US 169, 183). Manifestly, these definitions are far more circumscribed than the definition of "records” added to FOIL in 1977.
 

 We therefore decline to adopt the narrow definition of "records” adopted by the Federal courts and applied here by the trial court and Appellate Division. To do so would undermine the legislative objective to provide maximum disclosure by enabling a government agency to insulate its records from public access by delegating responsibility for creating or maintaining particular information to a nongovernmental entity. Rather, we conclude that information kept or held for a government agency — such as the booklist sought by Encore — is within the embrace of FOIL’S "records.” Because SUNY has not claimed the benefit of any FOIL exemption, it must make the booklist available to Encore.
 

 III.
 

 Turning to ASC, we need not determine whether it constitutes an agent or alter ego of the university, since we conclude that ASC has sufficiently demonstrated that the information is exempt from disclosure
 
 (see, Matter of Russo v Nassau County Community Coll.,
 
 81 NY2d at 700).
 

 ASC urges that, even if it is subject to FOIL, the information is shielded by the exemption set forth in section 87 (2) (d),
 
 *419
 
 which provides that an agency may deny access to records that "are * * * derived from information obtained from a commercial enterprise and which if disclosed would cause substantial injury to the competitive position of the subject enterprise” (Public Officers Law § 87 [2] [d]). It is undisputed that the book-list was compiled by and obtained from Barnes & Noble, a commercial enterprise. Consequently, the question before us is whether release of the information would cause "substantial injury to the competitive position” of Barnes & Noble.
 

 FOIL fails to define substantial competitive injury. Nor has this Court previously interpreted the statutory phrase. FOIA, however, contains a similar exemption for "commercial or financial information obtained from a person and privileged or confidential”
 
 (see,
 
 5 USC § 552 [b] [4]). Commercial information, moreover, is "confidential” if it would impair the government’s ability to obtain necessary information in the future or cause "substantial harm to the competitive position” of the person from whom the information was obtained
 
 (National Parks & Conservation Assn. v Morton,
 
 498 F2d 765, 770 [DC Cir];
 
 see also, CNA Fin. Corp. v Donovan,
 
 830 F2d 1132, 1152, n 146 [DC Cir],
 
 cert denied
 
 485 US 977 [noting congressional acquiescence to the
 
 National Parks
 
 standard]).
 

 Notably, this Federal requirement of "substantial harm to the competitive position” of the submitting entity was already in place in 1977 when the Legislature incorporated the comparable condition of "substantial injury to the competitive position of the subject enterprise” into Public Officers Law § 87 (2) (d)
 
 (see, e.g., National Parks & Conservation Assn. v Morton,
 
 498 F2d 765,
 
 supra).
 
 Furthermore, when it amended subdivision (2) (d) in 1990, the Legislature maintained the substantial competitive injury requirement
 
 (see, L
 
 1990, ch 289).
 
 *
 
 Indeed, the legislative history refers to the similarity between the FOIL exemption and the Federal exemption for commercial information
 
 (see,
 
 Mem of State Dept of Economic Development, 1990 McKinney’s Session Laws of NY, at 2411).
 

 By utilizing and continuing language virtually identical to the analogous Federal exemption for commercial information, the Legislature has signalled its intent that the substantial competitive injury prong of the FOIL exemption be similar in
 
 *420
 
 scope to the substantial competitive harm prong of its Federal counterpart. We therefore look for guidance to Federal cases interpreting this requirement.
 

 As established in
 
 Worthington Compressors v Costle
 
 (662 F2d 45, 51 [DC Cir]), whether "substantial competitive harm” exists for purposes of FOIA’s exemption for commercial information turns on the commercial value of the requested information to competitors and the cost of acquiring it through other means. Because the submitting business can suffer competitive harm only if the desired material has commercial value to its competitors, courts must consider how valuable the information will be to the competing business, as well as the resultant damage to the submitting enterprise. Where FOIA disclosure is the sole means by which competitors can obtain the requested information, the inquiry ends here.
 

 Where, however, the material is available from other sources at little or no cost, its disclosure is unlikely to cause competitive damage to the submitting commercial enterprise. On the other hand, as explained in
 
 Worthington'.
 

 "Because competition in business turns on the relative costs and opportunities faced by members of the same industry, there is a potential windfall for competitors to whom valuable information is released under FOIA. If those competitors are charged only minimal FOIA retrieval costs for the information, rather than the considerable costs of private reproduction, they may be getting quite a bargain. Such bargains could easily have competitive consequences not contemplated as part of FOIA’s principal aim of promoting openness in government”
 
 (id.).
 

 The reasoning underlying these considerations is consistent with the policy behind subdivision (2) (d) — to protect businesses from the deleterious consequences of disclosing confidential commercial information, so as to further the State’s economic development efforts and attract business to New York
 
 (see,
 
 Mem of State Dept of Economic Development,
 
 op. cit.,
 
 at 2412). The analogous Federal standard would advance these goals, and we adopt it as the test for determining whether "substantial injury to the competitive position of the subject enterprise” would ensue from disclosure of commercial information under FOIL.
 

 Next applying that test to Encore’s request for the Barnes & Noble booklist, we conclude that the material was
 
 *421
 
 exempt from disclosure. Contrary to Encore’s contention, ASC was not required to establish actual competitive harm to Barnes & Noble. Rather, "[a]ctual competition and the likelihood of substantial competitive injury is all that need be shown”
 
 (Gulf & W. Indus. v United States,
 
 615 F2d 527, 530 [DC Cir]).
 

 Encore concedes that it wants the textbook information in order to sell the very same books to the very same SUNY students that patronize Barnes & Noble, its competitor. Likewise, the booklist has obvious commercial value to Encore since it would enable Encore to offer the precise inventory that its target clientele — SUNY-Farmingdale students — is required to purchase and that is currently offered by Barnes & Noble. The potential damage to Barnes & Noble as a result is the loss of student customers to its competitor and a corresponding loss of profits. Indeed, Barnes & Noble alleges that after providing the 1993 spring semester booklist to Encore the campus bookstore suffered a significant decrease in sales revenue
 
 (see, e.g., Continental Oil Co. v Federal Power Commn.,
 
 519 F2d 31, 35 [5th Cir] [relying on probability of damage from delivery of product marketing information to competitor]).
 

 The likelihood of harm to Barnes & Noble is enhanced by the economic windfall conferred upon Encore were it to receive the booklist at the mere cost of FOIL fees. The information in the booklist, accumulated by virtue of the effort and expense of Barnes & Noble, is also directly available to Encore. Disclosure through FOIL, however, would enable Encore to obtain the requisite information without expending its resources, thereby reducing its cost of business and placing Barnes & Noble at a competitive disadvantage.
 

 Because the likelihood of substantial competitive injury to Barnes & Noble from release of the textbook information to Encore is apparent, ASC has met its burden of establishing that the material falls "squarely within the ambit of one of [the] statutory exemptions”
 
 (Matter of Fink v Lefkowitz,
 
 47 NY2d at 571). We therefore need not determine whether, as held by the trial court, the material was also exempt because its release would impair current contract awards (Public Officers Law § 87 [2] [c]).
 

 Accordingly, the order of the Appellate Division should be modified in accordance with this opinion and, as so modified, affirmed, without costs.
 

 
 *422
 
 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order modified, etc.
 

 *
 

 Prior to 1990, FOIL exemption subdivision (2) (d) was expressly limited to information maintained for purposes of regulation which, if disclosed, would cause substantial competitive injury. The 1990 amendment broadened the exemption by eliminating the condition that the confidential commercial information be for regulatory purposes
 
 (see,
 
 L 1990, ch 289).